**UNITED STATES of America**

v.

**Max H. HOMER.**

**Crim. No. 75–227.**

United States District Court,
W. D. Pennsylvania.

Feb. 26, 1976.

---

Carl LoPresti, Pittsburgh, Pa., for plaintiff.

Stanley W. Greenfield, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

KNOX, District Judge.

The above-named defendant was convicted of three counts of a nine-count indictment by a verdict of a jury after a twelve day trial. The counts on which he was found guilty involved two charges of violation of the Hobbs Act (18 U.S.C. § 1951) by extorting money in such a way as to obstruct, delay or affect interstate commerce and one count of a false declaration to a Grand Jury (18 U.S.C. § 1623).

The indictment originally contained nine counts. Count one concerned extortion from Gordon Terminal Services, Inc. Count two covered extortion from Ruthrauff, Inc., both business concerns located in McKees Rocks, Allegheny County, Pennsylvania. Count three covered attempted extortion from a business concern operated by Frank Roman doing business as Rocks Plumbing and Heating Company. Count four covered obstruction of justice with respect to the testimony of one Ernest Bulgarelli an inspector for the Pennsylvania Department of Labor and Industry. Count five covered a false declaration to the Grand Jury relative to a request to Bulgarelli to furnish plans to one Joseph J. Balobeck in connection with the construction of a building for Gordon Terminal Service, Inc. Counts 7 and 9 covered evasion of income tax and filing a false income tax return for the year 1971. The original indictment also contains Counts 6 and 8 relative to income tax violation for the year 1968. By order dated June 9, 1975, Counts 6 and 8 were ordered severed, because in the opinion of the court they were not related to the extortion and other counts in the indictment, whereas Counts 7 and 9 were related to the obtaining of extortion money during the year 1971. There has as yet been no trial with respect to the charges contained in Counts 6 and 8. To avoid confusing the jury, Counts 7 and 9 were renumbered as Counts 6 and 7 for the purpose of this trial.

The jury, after lengthy deliberations, convicted the defendant on Counts 1, 2 and 5, but acquitted him on Counts 3, 4, 6 and 7.

The defendant has filed a motion for new trial or for judgment of acquittal with respect to this conviction on the three counts, 1, 2 and 5. The defendant did not argue that there was insufficient evidence to convict him of extorting money from the two firms named (hereinafter referred to as Gordon Oil, mentioned in Count 1 and Ruthrauff, referred to in Count 2), if the court's interpretation of the Hobbs Act 18 U.S.C. § 1951 applying the decision of the Court of Appeals for the Third Circuit in *United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975) is correct. There was ample evidence from which the jury would have been justified in finding that both of these firms had sufficient nexus with interstate commerce to meet the test in *Mazzei*, supra. *United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1971) and *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975). The evidence, if believed by the jury, as it obviously was, indicated that with respect to Gordon Oil the defendant at the time in question, viz: April through July, 1971, being a member of the House of Representatives of Pennsylvania, did extort the sum of $6500

from the representatives of Gordon Oil for the purpose of securing a permit to occupy a new building erected by them and then ready for occupancy subject to the approval of the Pennsylvania Department of Labor and Industry. Bulgarelli was an inspector for this department for whom the defendant had secured his job. The government's evidence also indicated the plaintiff also extorted the sum of $3,010 from one Laux, representative of Ruthrauff, who also had a need to occupy a new building and as to which the occupancy was questioned by Bulgarelli.

Following the jury's verdict which was rendered on August 21, 1975, the defendant filed a motion for judgment of acquittal or in the alternative for a new trial on August 29, 1975, which alleges various errors made during the trial and also claims judgment of acquittal should be granted because the evidence did not show that defendant was acting under color of official right as required by the provisions of 18 U.S.C. § 1951.[1]

Under Rules 29, 33 and 34 of the Federal Rules of Criminal Procedure, motions for judgment of acquittal, for a new trial and in arrest of judgment must be made within seven days after verdict or "within such further time as the court may fix *during the seven-day period.*"

■ Under Rule 45(a), it is clear that the last day for filing such a motion was Thursday, August 28, 1975, and under Rule 45(b) the court has no power to extend the time for filing such motions. The court is therefore without authority to consider the original motion for judgment of acquittal or for new trial. See *United States v. Johnson,* 487 F.2d 1318

(5th Cir. 1974); *Rowlette v. United States,* 392 F.2d 437 (10th Cir. 1968); *United States v. Mathews,* 335 F.Supp. 157 (W.D.Pa.1971).

Defendant cites *Hauger v. Hauger,* 376 Pa. 216, 101 A.2d 632 (1954) as standing for the proposition that procedural defects can be waived. Basically, that case holds that it is too late to raise procedural defects unobjected to after a sale in partition where a party does not find the result to his liking. It was not a criminal case and being a state case, this court is not bound by it in construing federal criminal rules which in no uncertain terms deny the court power to consider these motions or to extend the time after the lapse of seven days.

■ In any event, the court has examined the record and has found no substantial error to the prejudice of the legal rights of the defendant in the matters complained of in the original motion for new trial. With respect to the motions for judgment of acquittal the court finds that there was ample evidence to justify the jury in determining that the defendant was acting under color of official right in receiving these payments from Gordon Oil and from Ruthrauff. Under *United States v. Mazzei,* supra, it was not necessary to determine that the defendant as a state legislator had the de jure power to dictate the holding up of occupancy permits for the new buildings which these business concerns had urgent need to occupy or to issue permits waiving certain alleged defects in the construction of the building. It was only necessary for the jury to determine that the businessmen in question had a reasonable belief that the state system so operated in the light of Bulgarelli's suggestion to them to see Homer and

1. *"Interference with commerce by threats or violence.*

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or *attempts or conspires* so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more

than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

\* \* \* \* \* \*

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

get the matter straightened out plus the fact that Homer had secured Bulgarelli's appointment as State Building Inspector. We therefore have a reasonable belief that the power in fact of defendant's office included effective authority to determine these matters and that exploitation of such a belief amounted to extortion under color of public office. That the defendant may have treated the sums received as political contributions or used them for other purposes is no defense and beside the point. See *United States v. Trotta*, 525 F.2d 1096 (2d Cir. 1975).

This disposition of the original motion for new trial and for judgment of acquittal does not, however, solve the matters covered in the supplemental motion for judgment of acquittal or in the alternative for a new trial filed November 14, 1975. This motion raises the question of the effect of certain matters upon the jury's verdict and requires the court to determine whether or not such matters as are raised in the motion and the affidavits filed in this court raise circumstances under which impeachment of a jury verdict is allowed. These items are covered in paragraphs 1, 2 and 3 of the supplemental motion. Paragraph 4 covers the question of severance of Counts 1 and 2 from Count 5 which is again a matter which should have been raised in the untimely motion for new trial and hence cannot be considered. *United States v. Mathews,* supra. In any event the court's memorandum and order of June 9, 1975, denying motion for severance except as to Counts 6 and 8 pertaining to unrelated income tax charges sufficiently covers this question.

Paragraph 5 of the supplemental motion relates to a lately discovered witness. It therefore appears that the matters raised in paragraphs 1, 2, 3 and 5 of the supplemental motion come within the "ground of newly discovered evidence" as a reason for new trial under Rule 33 which reasons can be raised at any time within two years. We will therefore now address ourselves to these matters, together with a motion still pending to quash a subpoena duces tecum against Roger Stuart, a newspaper reporter.

## I.  *Impeachment of Verdict.*

The supplemental motion in paragraphs 1, 2 and 3 allege that the deliberations of the jury were affected by the introduction of extraneous and impermissible matter prejudicial to the defendant, that certain jurors believed the defendant to be innocent but were told that the majority would prevail and that the majority believed the defendant guilty. For this reason, it is alleged that the jurors in question signed the verdict slip, that the verdict as signed by them and returned was not their verdict and that when they were polled these two jurors did not understand the questions being asked and thought they were only being asked whether they were present. When they were sequestered for the night during deliberations, it is alleged that various jurors watched and heard news broadcasts concerning the trial of the defendant in violation of the court's instruction and that at least one juror was able to utilize the telephone in his room to communicate with his wife.

Fortunately, we have very clear guidelines recently established by the court of appeals for our circuit to deal with attempts to overturn a verdict on such grounds. In *Government of Virgin Islands v. Gereau,* 523 F.2d 141 (3d Cir. 1975), the court said:

"Any attempt to impeach a jury verdict initially encounters two evidentiary obstacles: (1) producing evidence competent to attack the verdict, and (2) establishing the existence of grounds recognized as adequate to overturn the verdict. And even where both obstacles are cleared, there must be a finding that the party seeking to impeach the verdict has suffered prejudice from the misconduct of the jury.

\*      \*      \*      \*      \*      \*

"It is frequently said to be the rule that a juror may not impeach his own verdict once the jury has been dis-

charged. *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). The rule was formulated to foster several public policies: (1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body. . . . The same accommodation of policies produced the general rule's major exception, which provides that ' "[a] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." ' *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), quoting *Woodward v. Leavitt*, 107 Mass. 453. 'Extraneous influence' has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of the defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intrajury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

* * * * * *

"Other than incompetency of a juror during jury service, see *United States v. Dioguardi*, supra, [492 F.2d 70 (2d Cir.)] at 79, and *Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432 (2d Cir. 1947), these are all incidents of 'extraneous influence:' (1) exposure of jury to news items 'about the matter pending before the jury,' *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); (2) consideration by the jury of extra-record facts about the case; (3) communications between third parties and jurors where relevant

to the case to be decided; (4) pressures or partiality on the part of the court.

* * * * * *

"As normal jury pressures and intra-jury influences may not be impeached by juror evidence, so also they constitute no grounds for overturning a verdict. See cases cited at notes 26 and 27, supra; *United States v. Grieco*, 261 F.2d 414 (2d Cir. 1958), cert. denied, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). Nor, indeed, is a verdict invalid merely because the jurors' generalized knowledge about the parties, or some other aspect of the case, is an ingredient of the decision. Though 'the specific guarantees of an impartial jury and of confrontation,' as well as 'the more general one of due process,' proscribe consideration of specific extra-record facts about the case on trial, it is not necessary that the jurors be 'totally ignorant about a' case. *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970) cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1974).

" 'We cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations.'

* * * * * *

"The third-party communication cases break down, factually, into three major subclasses: (1) cases where jurors glean from non-jurors facts or opinions *concerning the liability or guilt of a defendant*; (2) cases involving attempts by outsiders to influence the verdict through intimidation or bribery of jurors; (3) cases where jurors come into personal contact with persons related to one side or another of the controversy before the jury. See generally *Comment*, supra, at 366–69.

* * * * * *

"Finally, were we to set aside the jury verdicts because of these rumors, we would be defeating the purposes served by the competency-sufficiency rules in this area of the law. See II–A, supra. If rumors such as these, filtering into the jury from no known source, were held sufficient to impeach these verdicts, jury tampering and harassment would be encouraged and we 'would add unduly to the already fragile state of criminal convictions.' McMann, supra, 435 F.2d at 817.

\* \* \* \* \* \*

"Even though a party establishes, by competent evidence, an act of jury misconduct sufficient to set aside a verdict, the verdict will stand unless the party has been prejudiced by the misconduct."

The Federal Rules of Evidence (effective July 1, 1975, and applicable here) also have very clear and succinct guidance of this kind. Rule 606(b) provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes."

The circumstances sought to be used by the defendant to impeach the jury verdict fall into three general categories:

(1) failure of jurors to understand that the jury verdict had to be unanimous and failure to understand questions asked at the time of the poll,

(2) exposure to publicity, and

(3) extraneous remarks by certain of the jurors.

With respect to item (1), two of the jurors have made answers under oath to questions propounded by the attorney for the defendant and these have been filed as exhibits in this case. In general, they allege that the jurors did not hear the instructions that the verdict had to be unanimous, secondly, they did not agree with the verdict and thirdly, they did not understand what they were doing when they answered the questions on the poll. It is clear that these contentions fall within the category of impermissible impeachment of a verdict by a juror after the verdict has been rendered. If jurors were permitted to impeach their own verdict by statements such as these no criminal case would ever be ended, and the inducement would be great for defendants to engage in private interviews of jurors in an endeavor to get them to say that they did not understand the court's instructions which were clear and thus upset every verdict which was rendered. As a matter of fact, in the instant case the record indicates that the defendant personally went to interview two jurors and thereafter his counsel and a court reporter put these jurors, Zacur and Wolf, under oath and asked them questions which were later filed in court as exhibits. Such harassment of the jurors after their verdict should not be tolerated. Such procedures can very easily degenerate into a situation with all kinds of subtle pressures being exerted. The court certainly would not tolerate the jurors being besieged by supporters of either side as they left the courtroom with harangues and threats. We recognize that jurors after completing their duties do have the right of free speech. We cannot muzzle them to prevent them from talking to whom they please. Here, however, the jurors were approached by persons who have lost the verdict in an endeavor to quiz them about their deliberations and whether or not they understood the court's instruc-

tions and the questions asked of them in the poll. It is apparent that if this continues in other cases particularly after the publicity received in this case with respect to this matter, it will have a chilling effect upon persons called to serve on juries if they are to be subjected to harassment of this kind. In the instant case, the court has received concerned inquiries from jurors other than the two involved inquiring why the court permits such questioning.

### (1) *Failure to understand instructions.*

For the present, all we can say is that it is clear that the jurors' attempts to impeach their verdict in this case do not rise to the levels required for such purposes. As far as the jurors understanding the court's instructions, the court's instructions were clear. The court not only once but twice referred to the fact that the verdict had to be unanimous.[2] The further statement that the jurors did not understand the questions asked at the time of the poll is also incredible. The transcript shows as follows with respect to juror Zacur.

"Mr. Greenfield: May we poll the jury, Your Honor?

"The Court : Yes, Mr. Finberg.

"Mr. Finberg: I will read the verdict again. As to Count 1, Gordon, guilty; as to Count two, Ruthrauff, Guilty; as to Count 3, Roman, not guilty; as to Count 4, Bulgarelli, not guilty; as to Count 5, false declaration, guilty; as to Count 6, evasion of tax, not guilty; as to Count 7, false return, not guilty.

"Juror No. 1, John Zacur, please rise. Is the verdict as read your verdict?

**2.** "You will have the verdict slip with you. There is space for twelve signatures on it. *And as you know, the verdict of the jury is the unanimous agreement of all twelve jurors. All twelve of you must sign the slip.*

"You will fill in the date, and if you find the Government has failed to establish the factors mentioned as to any particular count, you will find the defendant not guilty on that count. If, however, you find the Government has proved its case against the defendant beyond a reasonable doubt on certain counts, then you will

"John Zacur, Juror No. 1: Yes.

\* \* \* \* \* \*

"Mr. Finberg: Bruce Wolf, Juror No. 9, is the verdict as read your verdict?

"Bruce Wolf, Juror No. 9: Yes."

### (2) *Exposure to Publicity.*

The court, from the beginning of this case, repeatedly cautioned the jury not to listen to, read or watch anything appearing in the news media with respect to this case. It was not deemed necessary to sequester jurors in order to insure compliance with this instruction during the trial. The jury was, however, sequestered during deliberations when they had not reached a verdict at approximately 10:00 p. m. and were sent to a hotel for the night again with the caution not to observe the news media with respect to this case. Juror Wolf says in his answers:

"Q: To your knowledge did the jurors in any way look at newspaper accounts or see television on the trial as it was ongoing?

"A: Not to my knowledge. I will say that I watched television the night we were at Chatham Center (the hotel where the jury was sequestered).

"Q: Do you know whether any others watched it that night?

"A: I really couldn't say. John and I—we were in the same room. We laughed about it."

Juror Zacur says nothing about it. There is nothing in this to indicate that anything prejudicial was communicated to these two jurors if they did violate the court's instruction and watch televi-

find the defendant guilty as charged on those counts.

"The verdict does not require any explanation of any kind by the jury. And you will see from the way we have set up the verdict slip that we instruct you to give a separate consideration to each of these counts and the testimony bearing upon it in arriving at your determination, *and make a finding specifically as to each count as you may agree by the unanimous finding of all members of the jury.*" (T. 1689) (Emphasis added)

sion. There is nothing to indicate that anything they heard was anything more than a factual statement that the jury had retired for the night and would resume deliberations in the morning. Nor is there any showing that anything these jurors may have heard on television was communicated to the others. The same is true of the allegation that one juror called his wife.

### (3) *Extraneous Matters Considered By the Jury.*

■ John Zacur says that when returning from lunch one prospective juror said he had a friend or relative who knew a state policeman in "Washington, Pennsylvania, or somewhere down there who said he heard that McKees Rocks were just a lot of racketeers." This person is identified as Allen Kiers, one of the jurymen selected. Zacur says that at no time was it indicated that Kiers had that view and the matter was dropped after that. He further states, however, during jury deliberations one girl said "Well, if he does get a guilty, he'll be out at the countryclub playing golf," and disparaging references were made as to other politicians. Juror Wolf says a couple of ladies said all politicians were crooks.

It should be noted that before trial the court conducted an individual voir dire of all the jurymen before the empanelling began. Each of the prospective jurors including Zacur, Wolf and Kiers was interrogated as to his knowledge of the case or anything he had heard about it, whether he had unfavorable opinions of those in political life or whether he knew of anything which would prevent him or her from bringing in a fair and impartial verdict under the evidence and instructions of the court. Each answered, "No."

■ It is certainly the law that evidence from a juror cannot be received when it is offered to show matters which essentially inhere in the verdict itself.

*Domeracki v. Humble Oil and Refining Co.*, 443 F.2d 1245 (3d Cir. 1971). We do not expect our jurors to be automatic robots with sterilized minds. They bring to the jury box a cross section of their experiences in life as experienced by any member of society. We cannot expunge from jury deliberations subjective opinions of jurors, their attitudinal mental processes or their philosophies. These involve the very human element that constitute one of the strengths of our jury system as a cross section of the community and we cannot and should not banish them from jury deliberations. *G. V. I. v. Gereau*, supra.

■ With respect to remarks of jurors in the jury room these matters inhere in a jury's verdict and a veil of secrecy and confidentiality must descend over them. "The jury's verdict of guilty cannot be impeached by the fact that a juror may have been influenced by the improper remark of a fellow juror." *United States v. Blackburn*, 446 F.2d 1089 (5th Cir. 1971). There is no showing that any jurors were improperly influenced by such remarks. Much of this would appear to be the ordinary give and take in discussions and arguments among jurors in the course of their deliberations.[3]

With respect to the remark made by Juror Kiers to Juror Zacur, there is no indication that Kiers harbored this view himself. There is no evidence that he or any other prospective juror said that the defendant Homer was a racketeer or that any of them replied untruthfully to the court's inquiry as to whether there was any reason why they could not bring in a fair and impartial verdict based upon the evidence and the instructions by the court. As a matter of fact, Zacur says that the matter was dropped after the original occurrence. (Zacur Affidavit, pg. 2).

The court further determines that there was no improper extraneous influence in watching a television newscast

---

**3.** The judicial rule against interrogating jurors as to their verdict except in cases of extraneous influences probably traces back to the landmark Bushel's Case, 6 Howell's State Tri-als 999 (1670). There it was held that a juror could not be fined for bringing in what appeared to the Crown to be a perverse verdict, in the trial of William Penn.

by two jurors contrary to the court's instructions and in a call, if made by one of the jurors to his wife to explain why he did not come home. There is no evidence that any such influence operated to bring about the verdict.

## II. *Subpoena to Newsman, Roger Stuart.*

What the court has previously said concerning impeachment of the jury verdict clearly indicates the disposition to be made of the motion to quash the subpoena to Stuart, the writer for the Pittsburgh Press. The articles written by Stuart in the newspaper are before the court and also the questions and answers given by the jurors Zacur and Wolf to questions propounded by defense counsel at which Stuart was present. It does not appear that Stuart can add anything with respect to these matters. There is nothing in all the material submitted indicating that Stuart's information contains anything not heretofore discussed which if received would amount to a permissible impeachment of a verdict.

▆ Stuart asked that the subpoena be quashed because in violation of the Pennsylvania Newspapers Reporters Privilege Act, 28 Purdon's PS 330 giving a reporter the privilege to refuse to disclose the sources of his information. We need not determine the extent to which the pleading of the so called Pennsylvania shield statute should be permitted in a criminal proceeding in federal court under *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). This court has previously ruled in *United States v. Grosso*, 72–102 Criminal (W.D. Pa.1973) that the shield statute should not be permitted to stand in the way where the inquiry goes to the heart of the matter in a criminal case in federal court, but the newsman should not be required to make disclosure where it appears that the subject to be disclosed is irrelevant or immaterial to the matter before the court. This it appears is true in this case.

Defendant argues that we cannot know what Stuart will say until he is put on the stand and under oath. To the extent, however, that the defendant seeks further information as to what Stuart may have elicited from inquiries among other jurors or unreported comments from jurors Zacur and Wolf this is tantamount to a mere fishing expedition which the court should not permit since this only leads to further harassment of jurors after they have rendered their verdict. This the court considers potentially a danger to the due administration of justice and should only be permitted in case of clear evidence of misconduct. For the same reason, the court considers that nothing has been shown which would justify the court in requiring the jurors severally to appear to inquire into extraneous influences for other matters which adhere in their verdict. The motion to quash will be granted. See *Cooper v. United States* (D.C.Cir. 10/31/75).

## III. *After Discovered Evidence.*

In the supplemental motion for judgment of acquittal or in the alternative for new trial filed November 14, 1975, the defendant in paragraph 5 asks for a new trial because of after acquired evidence set forth in an affidavit attached thereto.

The affidavit is made by one Barbara Serretti. The affiant states that she resided in McKees Rocks from 1964 until January 1972, across from the parking lot of the McKees Rocks plant of Ruthrauff, Inc., one of the two business entities from which extortion was claimed by the government. She says that she had become friendly with Mr. Laux, President of Ruthrauff, and Mr. Guthrie his Administrative Assistant. Laux was an important witness at the trial with respect to Count 2 of the indictment. She observed defendant Homer entering the main entrance to the Ruthrauff facility and that Guthrie explained that he was assisting Ruthrauff to obtain a permit so that Ruthrauff could commence its business operation. It was later stated that a permit had been obtained and that Homer was there

attempting to persuade Ruthrauff to employ members of the McKees Rocks black community. She says that in April or May, 1971, she was visited by Guthrie and Laux who complained about Homer's attempts to persuade them to hire members of the black community, that they planned to make a financial contribution to be used for the benefit of the local black community and that this was the purpose of the contribution made to Homer. She further says that she moved to Fairmont, West Virginia, in January, 1972, and was not aware of the criminal proceedings against the defendant until she heard a newscast on August 21, 1975.

This type of evidence to contradict and impeach the testimony of witnesses Laux and Westman was already presented at the trial of this case by the defendant in the testimony of various other witnesses, to wit: Jones, Parilla and also the defendant himself. The jury to the contrary was convinced that this was not the purpose of the contribution and in any event this would not justify extortion.

It is apparent that if a new trial was awarded the effect of the Serretti testimony would only be further to contradict Laux and Westman and therefore would be cumulative only as to Count II of the indictment.

The general test to be applied in determining whether to grant a new trial on the basis of newly discovered evidence is that it must be of such a nature that it will probably produce an acquittal in the event of re-trial. See Moore Fed.Practice Rules of Criminal Procedure 33.04. Tests are set forth in Moore 33.03(1), namely, (1) the evidence must have been discovered since the trial, (2) failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence, (3) it must be material to the issues of trial. (4) it must be of such a nature it would probably produce an acquittal in the event of re-trial. We assume that the evidence in question could not have been discovered with due diligence by the defendant at or before the time of trial. We hold, however, that the proffered Serretti testimony fails because it is merely cumulative or impeaching which is insufficient. See *Mesarosh v. United States*, 352 U.S. 1, at page 9, 77 S.Ct. 1, at page 5, 1 L.Ed.2d 1, at page 3 (1956), citing *United States v. Rutkin*, 208 F.2d 647 (3d Cir. 1953). The court further holds that evidence of this nature since it has already been covered by at least three witnesses at the trial could not be said probably to produce an acquittal in the event of new trial. In any event, it obviously has nothing to do with defendant's guilt under Count I. See also *Giordano v. McCartney*, 385 F.2d 154 (3d Cir. 1967).

For all of the above reasons, we will deny the motions for new trial or in the alternative for judgment of acquittal as filed by the defendant.