**GOVERNMENT OF the VIRGIN ISLANDS**

v.

**NICHOLAS, Connie, Appellant.**

No. 83–3430.

United States Court of Appeals, Third Circuit.

Argued April 27, 1984.

Decided March 29, 1985.

Rehearing and Rehearing In Banc Denied May 7, 1985.

Garth, Circuit Judge, concurred in part, dissented in part, filed opinion, and would grant rehearing.

Michael A. Joseph (argued), Federal Public Defender, Christiansted, St. Croix, V.I., for appellant.

James W. Diehm (argued), U.S. Atty., Christiansted, St. Croix, V.I., for appellee.

Before SEITZ, Chief Judge, and GARTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge:

In this appeal we are asked to determine whether the district court abused its discretion in denying without an evidentiary hearing defendant's motion to vacate, set aside and correct a sentence under 28 U.S.C. § 2255.

Defendant Connie Nicholas ("Nicholas") was convicted of first-degree murder, 14 V.I.C. §§ 921 and 922(a)(2), assault in the first degree, 14 V.I.C. § 295(1), robbery in the first degree, 14 V.I.C. § 1862(2), grand larceny, 14 V.I.C. § 1083(1), and possession of an unlicensed firearm during the commission of a violent crime, 14 V.I.C. §§ 2253(a) and 2254. On appeal, the first-degree murder conviction was vacated and the case remanded to the district court for resentencing on the lesser included offense of second-degree murder. *Government of the Virgin Islands v. Nicholas*, 707 F.2d 1391 (3d Cir.1982). Following resentencing, Nicholas filed a section 2255 motion seeking to vacate and set aside his sentence. As grounds for relief, he alleged, *inter alia*, that he was denied his constitutional right to a unanimous verdict because of juror incompetence and that he was denied his constitutional right to effective assistance of counsel because trial counsel failed to object to certain testimony. The district court denied the motion without an evidentiary hearing.

In this, his second appeal before this court, Nicholas argues that the district court's denial of his claims without an evidentiary hearing was an abuse of discretion. We will affirm the district court's ruling that the appellant failed to prove that he had a right to an evidentiary hearing on the issue of juror incompetence, but we will remand the case to the district court for an evidentiary hearing on the issue of ineffective assistance of counsel.

## I. JUROR INCOMPETENCE

A section 2255 petition is not a substitute for an appeal. *United States v.*

*Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982), nor may it be used to relitigate matters decided adversely on appeal, *United States v. Orejuela,* 639 F.2d 1055, 1057 (3d Cir.1981). The standard for review is clear:

> A section 2255 motion is addressed to the discretion of the trial judge in the first instance, and where the record affirmatively indicates that the claim for relief is without merit, a refusal to hold a hearing will not be deemed an abuse of such discretion.

*Page v. United States,* 462 F.2d 932, 933 (3d Cir.1972). *See also Diamond v. United States,* 432 F.2d 35, 37, 39 (9th Cir.1970); *Brisco v. United States,* 368 F.2d 214, 215 (3d Cir.1966).

In the instant case, the primary issue is whether the record "affirmatively indicates that the claim for relief is without merit" and therefore whether the trial judge properly denied appellant an evidentiary hearing on the issue of a juror's alleged inability to hear portions of the trial and on the issue of ineffective assistance of counsel. If the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by Nicholas in support of his motion for post-conviction relief, and if Nicholas would not be entitled to post-conviction relief as a matter of law, even if those factual allegations were true, the district court did not abuse its discretion in electing not to conduct an evidentiary hearing. *Friedman v. United States,* 588 F.2d 1010, 1015 (5th Cir.1979). *See Smith v. United States,* 635 F.2d 693 (8th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1397, 67 L.Ed.2d 368 (1981).

We find that (1) the record and the trial judge's personal observations in this case negate an allegation of juror Jeffrey Fleming's inability to hear and that (2) even if the juror was unable to hear portions of the evidence, Nicholas would not be entitled to post-conviction relief as a matter of law because under Fed.R.Evid. 606(b), the juror would be incompetent to so testify.

## A. *The Factual Setting*

To support the allegation of juror incompetence, Nicholas submitted juror Jeffrey Fleming's sworn affidavit dated February 23, 1983 with his section 2255 motion. In the affidavit, Fleming stated that he is partially deaf because of an ear injury. Appendix ("App.") at 12–13. Consequently, he must wear a hearing aid although he can read lips. During the two-day trial, Fleming stated that he removed his hearing aid due to discomfort and was often unable to understand the proceedings when he could not see the lips of the witnesses, attorneys, and judge. Fleming also stated that he had been excused from jury service on two previous occasions due to his hearing impairment and that this was the first time that he was permitted to serve as a juror. Fleming was selected as a juror in the Nicholas case in July of 1981 but did not contact the Federal Public Defender's office and swear out this affidavit until February of 1983—one year and eight months after the verdict was rendered.

Fleming later recanted the contents of his sworn affidavit in the presence of an Assistant U.S. Attorney and a local police officer. Fleming told them that he had understood completely what was said during the trial and stood by his guilty verdict. He further indicated that throughout the trial his hearing aid was in good operating condition and that he removed his hearing aid just briefly during the lawyers' argument to change batteries.

An affidavit was drafted by an Assistant U.S. Attorney and a police officer for Fleming to sign attesting to his ability to hear the trial proceedings, but Fleming refused to sign, wanting first to contact the Federal Public Defenders' Office. However, in a signed handwritten note, Fleming adopted the contents of the prepared draft. The handwritten note, the unsigned affidavit, and the affidavits of those enforcement officials present during the recantation were submitted by the government to the district court as rebuttal evidence.

The district court gave little credence to Fleming's original assertion that he could

not hear the trial proceedings because "of the glaring inconsistencies" presented by the affidavits, Fleming's handwritten note, and based on its own observation. App. at 43. The district court noted that the prospective jurors were asked twice whether they had difficulty in hearing, first during the jury selection and then again prior to the taking of testimony. No juror indicated any such difficulties. The district court also noted that a loudspeaker was positioned over the jury box and that the jurors had an unobstructed view of the witness stand. App. at 43–44. Throughout the trial, Fleming did not disclose any failure to understand any of the proceedings. Furthermore, the district court pointed to court records demonstrating that Fleming had in fact served as a juror twice before. App. at 43.[1]

From the above scenario it is evident that there were only four major sources of evidence for the trial court to review to determine whether there should be an evidentiary hearing: (1) Fleming's affidavit for defense counsel and his separate contradictory statement to the U.S. Attorney, (2) the procedures of the judge during the trial including explicit inquiries made expressly to the jury as to their ability to hear, (3) the observations of the trial judge as to the ability of jurors to hear and respond to his inquiries and the evidence, and (4) Fleming's contradictory statements regarding his prior jury experience.[2]

The trial court judge understated the conflict when he said that Fleming's two statements were "glaring inconsistencies"; he should have said the documents were totally contradictory. In his statement to the Assistant United States Attorney and Officer Vasquez, Fleming stated that he heard and understood all the evidence in the case except for two times during the lawyers' argument when he took off his hearing aid

1. According to the Clerk of the District Court of the Virgin Islands, Fleming was selected to serve twice as a juror prior to the Nicholas case.

2. The trial judge in his opinion excerpted the following portions of the affidavits and statements relating to Jeffrey Fleming:

JEFFREY FLEMING, being duly sworn, deposes and says:

1. In 1967, during military service in Vietnam, I suffered an injury which resulted in partial deafness in both ears.

2. I, therefore, find it necessary to read lips, after having been formally educated to do the same, and wear an electronic hearing aid in order to improve my ability to communicate.

3. On or about 1981, I was selected to serve as a juror in this case.

4. During the two day trial of this case, I often was unable to decipher what was being said because of removal of my hearing aid due to discomfort and my inability to directly see the lips of the witnesses and/or the attorneys and/or the judge, and, of course, insufficient volume of voice.

5. That was the first and only time I had served on a jury.

6. Subsequently, I was excused twice from jury service because of my hearing impediment; once by the attorney calling attention to my hearing aid to the judge and, the other by Judge Raymond Finch after he was convinced that I had trouble hearing him.

App. at 41, n. 4.

The affidavits of officer Vasquez and Assistant U.S. Attorney Capdeville both read in relevant part:

2. On Tuesday, May 10, 1983, in my presence, Jeffrey Fleming stated the following:

(a) He stated that he had no problem hearing and understanding the judge's voir dire of the jury panel during jury selection for the Connie Nicholas case;

(b) He stated that to the best of his knowledge he heard and understood all the evidence in the case except for two times during the lawyer's arguments when he took off his hearing aid to change the batteries;

(c) He stated that during the times when he changed the batteries, he was able to read the lips of the attorneys;

(d) He stated that he took part in jury deliberations and was convinced that the defendant was guilty;

(e) He stated that he told the judge the same thing during the poll of the jury after the verdict was delivered;

(f) He stated that he continues to this day to stand by his verdict of guilty;

3. That during the lunch hour on Wednesday, May 11, 1983, Mr. Fleming appeared in the U.S. Attorney's Office and was shown a written statement which he read very carefully and thoroughly, a copy of the statement is appended hereto;

4. That after reading the statement he stated in my presence the statement is true;

5. That Mr. Fleming consistently represented that the statement was true and accurate.

App. at 42–43, n. 5.

to change the batteries. He stated that during the times when he changed the batteries, he was able to read the lips of the attorneys, and that he was able to follow all of the evidence. App. at 42. To the defense counsel he said that "[d]uring the two-day trial of this case, I often was unable to decipher what was being said because of removal of my hearing aid due to discomfort and my inability to directly see the lips of the witnesses and/or the attorneys and/or the judge and, of course, insufficient volume of voice." *Id.* at 41. The transcript does not indicate that Fleming had any significant difficulty understanding what was being said.

## B. *The Burden of Proof*

Because contested fact issues in section 2255 cases cannot be resolved on the basis of affidavits alone, *Friedman v. United States,* 588 F.2d at 1015, we believe that the trial judge properly gave little weight to the inconsistencies in the affidavits. The supposedly new information concerning Fleming's inability to hear was substantially undermined by his later recantation. The affiant certainly repudiated his first sworn statement. *See Ostrer v. United States,* 577 F.2d 782, 788–89 (2d Cir.1978). Moreover, it was appropriate for the trial judge to draw upon his personal knowledge and recollection in considering the factual allegations in the Nicholas' section 2255 petition that related to events that occurred in his presence. *See Machibroda v. United States,* 368 U.S. 487, 494–95, 82 S.Ct. 510, 513–14, 7 L.Ed.2d 473 (1962). *See also United States v. Sears,* 663 F.2d 896, 900 (9th Cir.1981); *Lyda v. United States,* 321 F.2d 788, 790–91 (9th Cir.1968) (trial court had the opportunity to observe juror closely before deciding that his hearing difficulty would not deny defendants' rights to due process or fair trial).

With an awareness of the contradictory statements by the same juror and the trial judge's express finding based on his personal observation at trial, what is the burden of proof that the appellant must

meet to establish his right to impeach the jury verdict through an evidentiary hearing where a juror would be questioned as to his ability to hear the testimony? At the outset we must note the extraordinary burden a party has who seeks to impeach a jury's verdict. Courts have placed such a great burden on the movant because of their fears that efforts to impeach a jury's verdict could destroy or damage the freedom of deliberations and the stability and finality of jury verdicts. They have been equally fearful that such inquiries could lead to annoyances, harassment and embarrassment of jurors.

Some of the most thoughtful statements about the potential dire consequences of such impeachment efforts have been written by federal trial judges. In *United States v. Homer,* 411 F.Supp. 972 (W.D.Pa. 1976) *aff'd* 545 F.2d 864 (3d Cir.1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977), after a verdict of guilty which the jury had said was unanimous, two jurors, pursuant to subsequent inquiry by defense counsel, gave a statement that they "believed the defendant to be innocent but were told that the majority would prevail and that the majority believed the defendant guilty. For this reason, it is alleged that the jurors in question signed the verdict slip, that the verdict as signed by them and returned was not their verdict and that when they were polled these two jurors did not understand the questions being asked and thought they were only being asked whether they were present." *Id.* at 976.

In exploring the implications of such post-verdict inquiries, Judge Knox wrote:

If jurors were permitted to impeach their own verdict by statements such as these no criminal case would ever be ended, and the inducement would be great for defendants to engage in private interviews of jurors in an endeavor to get them to say that they did not understand the court's instructions which were clear and thus upset every verdict which was rendered. As a matter of fact, in the instant case the record indicates that the

defendant personally went to interview two jurors and thereafter his counsel and a court reporter put these jurors, Zacur and Wolf, under oath and asked them questions which were later filed in court as exhibits. Such harassment of the jurors after their verdict should not be tolerated. Such procedures can very easily degenerate into a situation with all kinds of subtle pressures being exerted. The court certainly would not tolerate the jurors being besieged by supporters of either side as they left the courtroom with harangues and threats. We recognize that jurors after completing their duties do have the right of free speech. We cannot muzzle them to prevent them from talking to whom they please. Here, however, the jurors were approached by persons who have lost the verdict in an endeavor to quiz them about their deliberations and whether or not they understood the court's instructions and the questions asked of them in the poll. It is apparent that if this continues in other cases particularly after the publicity received in this case with respect to this matter, it will have a chilling effect upon persons called to serve on juries if they are to be subjected to harassment of this kind. In the instant case, the court has received concerned inquiries from jurors other than the two involved inquiring why the court permits such questioning.

*Id.* at 978–79.

In *Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), we established guidelines for determining whether to allow the impeachment of a jury's verdict. In *Gereau,* we stated:

Any attempt to impeach a jury verdict initially encounters two evidentiary obstacles: (1) producing evidence competent to attack the verdict, and (2) establishing the existence of grounds recognized as adequate to overturn the verdict. And even where both obstacles are cleared, there must be a finding that the party seeking to impeach the verdict has suffered prejudice from the misconduct of the jury.

*Gereau,* 523 F.2d at 148.

In discussing the question of competent evidence, the first evidentiary obstacle, we recognized the general rule prohibiting a juror from impeaching his own verdict once the jury has been discharged where the testimony was proffered " 'to show matters which essentially inhere in the verdict itself.' " *Id.* at 149 (citations omitted). Because jury verdicts are accorded a high degree of sanctity, jurors are prohibited from testifying for impeachment purposes as to their mental processes as jurors and as to matters concerning intra-jury deliberations. *Id.* at 148–50. Such a rule fosters the public policies of:

(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body.

*Id.* at 148. This rule has withstood allegations of juror incompetence; questions concerning the competency of a jury ordinarily are not entertained once the jury has rendered its verdict. *United States v. Allen,* 588 F.2d 1100, 1106 n. 12 (5th Cir.1979).

The case of *United States v. Dioguardi,* 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), has been construed as recognizing an exception to this general rule by requiring a *strong showing* that a juror was incompetent in order to overcome the presumption of competency. *Id.* Although the ultimate factual question is whether Fleming was in fact incapable of rendering satisfactory jury service, the concise legal question before this court is whether enough evidence was presented to the trial judge to require holding a hearing to determine Fleming's capacity to hear.

*Dioguardi,* exemplifies the extreme caution of federal courts to allow post-verdict inquiries of jurors. In *Dioguardi,* ten days

after the verdict, a juror sent an unsolicited letter to the defendant. "The letter was written on stationery bearing the zodiac sign of Libra, and on one page the legend that it was the 'heavenly house under which I was born in.'" *Id.* at 75. The juror stated that she had clairvoyant powers which enabled her to see that Dioguardi was basically a good person, and she urged him to "repent," stating:

I have eyes and ears that I can see things before it happen. I can tell you about other and what they are thinking and doing .... [my eyes] are only partly open ... Unfortunate, a curse was put upon them some years ago. I have some people working on them.

*Id.*

Defense counsel submitted her letter to seven psychiatrists, all of whom stated that her letter "indicated hallucinatory tendencies, symptoms of possible psychosis, paranoia, and grandiosity, and in general an inability to appreciate reality without fantasizing." *Id.* at 76. On the basis of these uncontradicted affidavits and statements by psychiatrists, the defendant alleged that the juror was mentally incompetent. In upholding the verdict in favor of the government, the majority held that the record did not have "substantial if not wholly conclusive evidence of incompetence," *id.* at 80, to warrant reversal of the trial judge's denial of a post-verdict hearing as to the competence of the juror.[3]

*Homer* where the trial judge denied an evidentiary hearing, is similar to the instant case; the jurors had claimed that they "did not hear the instructions that the verdict had to be unanimous." *Homer, supra,* 411 F.Supp. at 978.

*Gereau* also reveals the risk of post-verdict inquiries. In *Gereau* the trial judge found that two jurors had given affidavits impeaching their prior verdict because of certain peer "pressures ... to change [their] verdict" and that "the affidavits were involuntarily made out of fear ..." *Gereau, supra,* 523 F.2d at 146. He found

that one of the jurors who had given an affidavit "also had fears about returning to the community and particularly to his friends in Fredericksted." *Id.*

■ The exceptions which permit a federal court to inquire as to the competence of a juror must be predicated on either the Federal Rules of Evidence or the due process clause of the Fifth Amendment or the impartial trial clause of the Sixth Amendment. The Federal Rules of Evidence 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's* deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b) (emphasis added). Because the district court believed that Fleming's sworn statement did not concern an extraneous influence, the district court concluded that the jury's verdict could not be impeached on this basis.

■ While the dissent correctly notes that the plain language of Rule 606(b) does not exclude evidence dealing with juror incompetence, as manifested by physical or mental infirmities, it gives only cursory treatment to those federal authorities that have concluded that juror incompetence is not an "external influence." *See Sullivan v. Fogg,* 613 F.2d 465 (2d Cir.1908); *Dioguardi, supra,* 492 F.2d at 79 n. 12; *United States v. Pellegrini,* 441 F.Supp. 1367 (E.D.

---

3. *Cf. Sullivan v. Fogg,* 613 F.2d 465, 467 (2d Cir.1980) (where the evidence of "potentially prejudicial influence" was strong enough to distinguish that case from *U.S. v. Dioguardi* and

"there was a sufficient showing of [juror] incompetence to justify, indeed to require, a further inquiry by the trial court.")

Pa.), *aff'd* 586 F.2d 836 (3d Cir.), *cert. denied,* 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978). It disregards the "specific reluctance to probe the minds of jurors once they have deliberated their verdict." *See e.g., Allen, supra,* 588 F.2d at 1106 n. 12.[4]

In *Pellegrini,* Judge Luongo denied a motion for new trial based on the contention that one of the jurors did not sufficiently understand the English language. Acknowledging that investigation may be conducted into "extraneous influences", the court held that the juror's understanding of the English language—or lack thereof—did not constitute "an extraneous influence". The district court relied upon the following language in *Dioguardi:*

> [A]bsent ... substantial if not wholly conclusive evidence of incompetency, courts have been unwilling to subject a juror to a hearing on his mental condition merely on the allegations and opinions of a losing party.

492 F.2d at 80.

Furthermore, the Second Circuit in *Sullivan,* grappling with the question of how strong a preliminary showing must be made in order to trigger a hearing into juror incompetence, similarly characterized issues of juror competence as matters pertaining to the internal deliberation process, again relying on *Dioguardi:*

> Once a preliminary showing of incompetence ... has been made there is a

corresponding right to an inquiry into the relevant surrounding circumstances [citations omitted] ... Improper *external influences* ... are presumptively prejudicial ... Where the allegations involve *considerations internal to the jury deliberation process, such as juror insanity,* this court has required strong evidence that it is likely that the juror suffered from such incompetence before ordering a post-verdict inquiry. *United States v. Dioguardi,* 492 F.2d 70, 78 (2d Cir.1974).

613 F.2d 465, 467 (emphasis added).

In the instant case, the evidence Nicholas seeks to elicit does not come under either of the two exceptions in Rule 606(b). Fleming's hearing problem is not "extraneous prejudicial information [that] was improperly brought to the jury's attention" and it is not an "outside influence [that] was improperly brought to bear upon any juror." It is obvious that the drafters of the rule were primarily concerned with jury tampering or improper communications to the jury, and they were not focusing on any physical disability such as a juror's difficulty in hearing during the trial.[5] Our reading of Rule 606 is that it does not sanction an inquiry of a juror on the issue of his partial deafness when the record is as ambiguous as the one that exists in the present case. As in *Pellegrini,* the record in this case is devoid of any indication that Fleming had any significant difficulty

---

**4.** The dissent unpersuasively attempts to distinguish these decisions by resort to consideration of state authorities by which we are not bound. *See e.g., Commonwealth v. Greiner,* 309 Pa.Super. 291, 455 A.2d 164, 166 (1983); *Commonwealth v. Golson,* 310 Pa.Super. 532, 456 A.2d 1063, 1066 (1983). We believe, however, that the afore-cited federal cases lend ample support to the result reached in this case.

**5.** Under the federal decisions the central focus has been upon insulation of the manner in which the jury reached its verdict, and this protection extends to each of the components of deliberation, including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process. Thus testimony or affidavits of jurors have been held incompetent to show a compromise verdict, *Hyde v. United States,* 225 U.S. 347, 382, 32 S.Ct. 793, 807, 56 L.Ed. 1114 (1912); a quotient verdict, *McDonald v. Pless,* 238 U.S. 264, 269, 35

S.Ct. 783, 785, 59 L.Ed. 1300 (1915); speculation as to insurance coverage, *Holden v. Porter,* 405 F.2d 878 (10th Cir.1969), *Farmers Coop. Elev. Ass'n v. Strand,* 382 F.2d 224, 230 (8th Cir.1967), cert. denied, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659; misinterpretations of instructions, *Farmers Coop. Elev. Ass'n v. Strand, supra;* mistake in returning verdict, *United States v. Chereton,* 309 F.2d 197 (6th Cir.1962); interpretation of guilty plea by one defendant as implicating others, *United States v. Crosby,* 294 F.2d 928, 949 (2d Cir.1961). The policy does not, however, foreclose testimony by jurors as to prejudicial extraneous information or influences injected into or brought to bear upon the deliberative process. Thus a juror is recognized as competent to testify to statements by the bailiff or the introduction of a prejudicial newspaper account into the jury room, *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). See also *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

understanding the evidence. Fleming made no response to the trial judge's repeated inquiries as to difficulty in hearing, he could read lips, and he had an unobstructed view of the witness stand in addition to the aid of a loudspeaker. Even accepting hearing difficulties, we find it difficult to understand Fleming's extreme delay in disclosing this comprehension problem to the court. "If he was really in the dark as to what was happening, one would expect that he would have said so much sooner." *Pellegrini,* 441 F.Supp. at 1371. The *Dioguardi* court indicated that "[t]he rule against any inquiry whatever recognizes exceptions only where there is *clear and uncontrovertible evidence* of incompetence *shortly before or after jury service.*" 492 F.2d at 79 (emphasis added.) It cannot be seriously contended that the present case satisfies the *Dioguardi* standard. Further, because of the contradictory statements of Fleming, the record does not have the "sufficiently strong evidence to warrant further inquiry," *Pellegrini, supra,* 441 F.Supp. at 1371.

■ Similarly, as to the constitutional claim, we do not find that on this record the defendant has met his substantial burden in proving that Fleming's alleged hearing problem was of such a magnitude that an evidentiary hearing was required as a matter of constitutional right. Somewhat like the 9th Circuit in *Lyda v. U.S.,* 321 F.2d 788, 791 (9th Cir.1963):

> We need not decide whether the Sixth [or the Fifth] Amendment would be violated by trial before eleven good men [and women] and true and one who is hard of hearing.

In this case it is sufficient to rule that defendant's evidence does not have that "strong showing" and clarity which would require an evidentiary hearing on the ultimate issue of what Fleming did or did not hear during the trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Nicholas also maintains that the district court erred in rejecting his ineffective assistance of counsel claim without an

Fed.R.Evid. 606(b) advisory committee note.

evidentiary hearing. The standard under which we determine adequacy of trial counsel for Sixth Amendment purposes was established in *Moore v. United States,* 432 F.2d 730 (3d Cir.1970) (en banc). In *Moore* we held: "[T]he standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." *Id.* at 736; *See also Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674, *reh'g denied* — U.S. —, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

On the issue of adequacy of legal services, the defendant bears the burden of demonstrating that the representation provided him by counsel was constitutionally inadequate, *United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 174 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), and that he was prejudiced by his attorney's inadequacies. *United States v. Swinehart,* 617 F.2d 336, 340 (3d Cir.1980); *Government of Virgin Islands v. Bradshaw,* 726 F.2d 115, 117 (3d Cir.1984) (appeal pending).

■ In this case, Nicholas contends that an evidentiary hearing is needed to determine whether he was prejudiced by trial counsel's failure to object to testimony concerning incriminating statements presumed to have been made by the defendant in a taped conversation with a government informant. Prior to trial, defense counsel requested that a spectrograph or voiceprint be conducted of the tape recording to determine whether the voice was that of the defendant. However, because the government indicated that the tape recording would not be used at trial, the tests were never performed. Nonetheless, at trial, the contents of the taped conversation were revealed upon questioning of Detective Petersen by the Assistant U.S. Attorney. Detective Petersen testified that he did not know with whom the informant was speaking on the tape but assumed it to be the defendant. When asked about what was overheard, the detective gave the following account:

I heard [the informant] ask the person with whom he was speaking what it was that went down with the iron. The person replied, "Man went on a farm in LaGrange, and the woman come out the car. The man went, followed and blaze one in the man. The man came out and stagger back, grab the woman hand, and the woman was screaming, and they were running. The man blazed one more, but I don't know if he get hit."

He also mentioned something to the effect that he had a job, whoever that person was, in St. Thomas to tighten up, and, if he got through, things would be airy.

He mentioned that—the [informant], rather, asked him, "Did you and the man have any struggle?"

The person replied, "No, the man and I didn't have no struggle at all. I blazed the man before he came out of the car."

[The informant] asked him if anyone else knew about this. He said "No, no, no, don't worry about that. Nobody ain't know nothing that went down here; nobody ain't know. They only guessing. Only I, man, know," and basically this is vaguely what I recall of the conversation on that specific date.

Trial Transcript ("Tr.") at 284–85.

Defense counsel did not object to the testimony. Instead, on cross-examination, the defense counsel requested any notes or reports that the detective made regarding his conversations with the informant. Thereafter, the prosecutor requested a sidebar conference and informed the trial judge that the government had Detective Petersen's transcript of the taped conversation but would not vouch for its accuracy because the tape was not "all that intelligible," even after having listened to it several times. Tr. at 286. Detective Petersen had listened to the taped conversation about 25 times before making a transcription. *Id.*

Nicholas argues that to assess the merits of his claim, a voiceprint analysis of the tape is needed. If the voiceprint analysis identifies the voice on the tape as belonging to someone other than the defendant, then it is Nicholas' contention that trial counsel's failure to object to testimony on the contents of the tape constituted prejudicial error. Therefore, Nicholas maintains that an evidentiary hearing is required.

Without addressing the merits of Nicholas' claim, we conclude that the factual record must be supplemented because the district court, on the basis of sheer speculation, determined that defense counsel's failure to object was a tactical decision, and therefore concluded that counsel was competent. There is no evidence in the record supporting or contradicting the district court's conclusion. Whether counsel acted with the requisite skill and whether the defendant suffered any prejudice as a result cannot be assessed without further fact-finding. Thus, we make no judgment as to whether trial counsel's performance was deficient, or whether if deficient, the defendant was deprived of his right to a fair trial. If the trial judge determines that trial counsel's performance was deficient, we still must evaluate the evidence in accordance with *Strickland.*

For the foregoing reasons, we will reverse the judgment of the district court and remand the case for an evidentiary hearing on the ineffective assistance of counsel claim, and we will affirm the district court in its denial of an evidentiary hearing as to the alleged incompetence of juror Fleming.

GARTH, Circuit Judge, concurring and dissenting: [1]

The question to be resolved here is whether a defendant being tried in a criminal case is entitled to a jury in which all of the jurors are capable of hearing all of the evidence. In this case we are concerned only with whether one of the jurors who

---

1. Although I disagree with the majority on the issue of an evidentiary hearing to determine juror Fleming's ability to hear, I do not disagree with the majority's conclusion that a remand is required with respect to the taped confession and the claim of ineffective assistance of counsel.

sat in judgment of the defendant Nicholas was deaf. Could juror Fleming hear the evidence presented at Nicholas' trial?

Fleming states under oath that he could not, and therefore did not, hear the testimony. True, he has also contradicted himself after filing his initial affidavit, claiming that he could hear. The district court,[2] while recognizing that there was an irreconcilable inconsistency between Fleming's two statements, nevertheless, did not attempt to resolve that conflict by determining the true fact at an evidentiary hearing. Rather, the district court, relying on its own "observations," concluded that a hearing was not necessary. It is from that ruling that Nicholas appeals.

Nicholas asks us only to order a hearing so that a finding may be made as to whether Fleming could hear or could not hear. Indeed, such hearings are invariably accorded in situations and contexts where disputes of fact occur. I recognize here that the factual dispute has been occasioned by the juror himself, but to my way of thinking, even given such a circumstance, there is no reason to forego our time-tested and traditional means for determining what the true fact is. Thus, to the extent that the majority, while remanding for a hearing with respect to the tapes, refuses to order a hearing with respect to juror Fleming's competence, I dissent.

### I.

Congress has provided the guidelines for establishing a juror's competence. 28 U.S.C. § 1865.[3] Section 1865(b)(4) recog-

nizes that a person is not qualified to serve on a jury if he or she is "incapable, by reason of mental or physical infirmity, to render satisfactory jury service." Here, of course, we are concerned not with the selection of a juror *prior* to trial, but rather with the physical qualifications of a juror who, having been impanelled, has since sat in judgment of the defendant.

The defendant, Nicholas, here claims that one of her jurors was incapable of hearing the trial testimony. While no statute or rule speaks to this situation, it is evident to me that if an individual would have been initially disqualified by a reason of deafness from serving on a jury, he must be disqualified as well after such service. With this consideration in mind, I turn to the problem presented by juror Fleming.

### A.

In July, 1981, the defendant, Nicholas, was convicted of the charged crimes. Jeffrey Fleming was one of the twelve jurors who returned a verdict of guilty. On February 23, 1983, Fleming filed an affidavit which contained these facts:

1. I was a juror in the above-captioned case.

2. In 1967, during military service in Vietnam, I suffered an injury which resulted in partial deafness in both ears.

3. I, therefore, find it necessary to read lips, after having been formally educated to do the same, and wear an electronic hearing aid in order to improve my ability to communicate.

---

2. Judge Irwin J. Silverlight was sitting by designation on the District Court of the Virgin Islands.

3. Section 1865(b) provides:

   (b) In making such determination the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—

   (1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

   (2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

   (3) is unable to speak the English language;

   (4) *is incapable, by reason of mental or physical infirmity, to render satisfactory jury service;* or

   (5) has a charge pending against him for the commission of, or has been convicted in a state or federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

   (Emphasis added).

   The Virgin Islands has also adopted its own very similar provisions for juror qualification. The corresponding section of the Virgin Islands Code provides that a juror is not qualified if he or she is "incapable by reason of mental or physical infirmities to render efficient jury service." 4 V.I.Code Ann. tit. 4, § 471.

4. On or about 1981 I was selected to serve as a juror in this case.

5. Prior to my selection I was not asked whether, nor to what extent, I suffered a hearing impediment.

6. During the two day trial of this case I often was unable to decipher what was being said because of removal of my hearing aid due to discomfort and my inability to directly see the lips of the witnesses and/or the attorneys and/or the judge, and, of course, insufficient volume of voice.

7. During the short jury deliberation, I voted not guilty but was immediately chastised, at which time various jurors began telling me what was purportedly said by the various witnesses.

8. Being in no position to object, I accepted their version of the testimony and joined in their vote for "guilty."

9. It was decided that since a male should read the verdict, and there being only one other a male on the jury, I would read the verdict.

10. That was the first and only time I had served on a jury.

11. Subsequently, I was excused twice from jury service because of my hearing impediment; once by the attorney calling attention to my hearing aid to the judge and, the other by Judge Raymond Finch after he was convinced that I had trouble hearing him.

12. I was troubled by these facts and I finally made contact with the Federal Public Defender's office on February 21, 1983.

App. at 12-13.

Thereafter, in May 1983, another Fleming "affidavit" was disclosed. The circumstances surrounding this latter affidavit are somewhat equivocal. As best as can be made out, the second affidavit was the result of an interview with Fleming conducted by a United States Attorney and a local police officer. Fleming himself refused to sign the second "affidavit," but a note written in Fleming's handwriting was annexed to the second "affidavit." The note, dated May 11, 1983, reads:

Everything I read and understand in this affidavit is true, but I would not sign until I have shown it to Mr. Michael Joseph [the federal public defender], because of manners to him and for him to understand what I am doing. I am not refusing to sign this affidavit, but I just want Mr. Joseph to no [sic] what i am doing.

(Supplemental App. at 14)

The second unsigned "affidavit" cannot be reconciled with the earlier February affidavit which it contradicts in material respects. The May affidavit reads:

1. I was the foreman of the jury in the criminal case of *Government of the Virgin Islands v. Connie Nicholas*, Criminal No. 81-36.

2. I suffer from a hearing difficulty but I am able to hear well with the assistance of a hearing aid. Additionally, through training I am able to read lips and understand, in that way, what is being said.

3. Prior to the beginning of the trial I heard Judge Silverlight ask whether for any reason any member of the jury panel could not serve as a juror and I did not raise my card. This was because I felt that I could serve as a juror, listen to all of the evidence, and render a fair and impartial verdict and I swore under oath that I would do so.

4. To the best of my knowledge and belief I heard and understood all of the proceedings in the case including the evidence, the arguments, and the instructions of the court.

5. Throughout the trial my hearing aid was in good operating condition and I left the hearing aid in my ear except for a very brief period of time to change the battery. This took place during the lawyers' argument.

6. Throughout the proceedings I was seated where I could see the judge, the witnesses, and the attorneys and read their lips.

7. I fully took part in the discussions in the jury room and was elected to be the jury foreman.

8. I read the jury's verdict of guilty in open court and was also asked whether this was my true verdict. I said that it was my verdict and at that time and today, May ___, 1983 it is still my verdict.

9. I would rather not have been involved as a juror in this case because of a fear in my mind of what may happen to me, but I continue to stick to my verdict of guilty.

10. I have read this affidavit and understand its contents and this affidavit has been read to me in the presence of the notary public.

Supplemental App. at 3–4.

Supplementing this adopted affidavit, are the affidavits of an Assistant United States Attorney, Douglas Capdeville, and a police officer assigned to the office of the United States Attorney, Francisco Vasquez. Other than the identifying paragraphs, both affidavits taken on June 27, 1983, are identical and in relevant part read as follows:

\*     \*     \*     \*     \*     \*

2. On Tuesday, May 10, 1983, in my presence Jeffrey Fleming stated the following:

(a) He stated that he had no problem hearing and understanding the judge's voir dire of the jury panel during jury selection for the Connie Nicholas case:

(b) He stated that to the best of his knowledge he heard and understood all the evidence in the case except for two times during the lawyer's arguments when he took off his hearing aid to change the batteries;

(c) He stated that during the times when he changed the batteries, he was able to read the lips of the attorneys;

(d) He stated that he took part in jury deliberations and was convinced that the defendant was guilty.

(e) He stated that he told the judge the same thing during the poll of the jury after the verdict was delivered;

(f) He stated that he continues to this day to stand by his verdict of guilty;

3. That during the lunch hour on Wednesday, May 11, 1983, Mr. Fleming appeared in the U.S. Attorney's Office and was shown a written statement which he read very carefully and thoroughly, a copy of the statement is appended hereto;

4. That after reading the statement he stated in my presence the statement is true;

5. That Mr. Fleming consistently represented that the statement was true and accurate.

Supplemental App. at 1–2, 5–6.

Also submitted with the adopted affidavit was an affidavit from Genevieve Holm, another Assistant United States Attorney. Her affidavit, taken on May 18, 1983, reads in relevant part:

\*     \*     \*     \*     \*     \*

2. On Wednesday afternoon, May 11, 1983, I went with Detective Francisco Vazquez [sic] to visit Mr. Jeffrey Fleming at his work site at the Charles Harwood Memorial Hospital in Christiansted.

\*     \*     \*     \*     \*     \*

5. I showed Mr. Fleming a copy of the affidavit (Exhibit A) [Fleming's second "affidavit"], and asked him what changes he would like to make in it so that it stated the truth.

6. Mr. Fleming told me that the affidavit was true as it was written.

\*     \*     \*     \*     \*     \*

11. I asked Mr. Fleming if he would sign the affidavit. He said that he would sign it, that it was true, but that he first had to speak with Mr. Michael Joseph.

12. Mr. Fleming explained that he had to speak with Mr. Joseph before he signed the affidavit so that Mr. Joseph would know what he was doing and would not think that he was doing something behind his back. Mr. Fleming said that because he had spoken with Mr. Joseph before he had spoken with us that he felt obligated to Mr. Joseph "because of manners."

13. I asked Mr. Fleming if he would mind writing his explanation in his own handwriting. He agreed, and composed

and wrote what is attached as Exhibit B [the handwritten note dated May 11, 1983].

Supplemental App. at 9–10.

Despite the substantial and material differences presented by the two sets of affidavits, and the "adoptive" circumstances surrounding the second "affidavit," the district court did not order a hearing so as to determine the true fact of Juror Fleming's hearing deficiency. Rather, in its opinion, the district court first stated that it gave little weight to Fleming's assertion that he could not hear the trial proceedings. However, the court then wrote: "In view of the fact that the affidavits (the signed one and the "adopted" one) are diametrically opposed, the Court is inclined to give no weight to either." App. at 43 n. 7. The district court further explained its resolution of Fleming's hearing problem by writing:

This position is further supported by the trial procedures utilized by the Court at the beginning of the trial wherein inquiry was made of the jurors as to whether any of them had difficulty in hearing the proceedings, and instructing them to raise their hand to signify such difficulty. (Trial Transcript p. 3). The same general question was posed again to the jury after their selection and immediately before the taking of testimony began. (Trial Transcript p. 39). On each occasion no juror indicated that he or she had a problem hearing what was going on. Finally, the Court notes that the District Court courtroom had a speaker immediately over the jury box and the jurors are positioned in such a manner as to *not* obstruct their view of the Judge, attorneys or witnesses.

In conclusion, it is noted that this court presided at the trial and had the opportunity to personally observe Juror No. 8 during the jury selection, preliminary instructions and at the time of polling of the jurors as to the verdict.[9]

At no time during any of these phases of the trial did the court discern any hearing or visual problem with regard to Juror Fleming.[10]

[9] Likewise Petitioner's counsel had the opportunity to observe Mr. Fleming during the entire trial.

[10] It is noted that the Court admitted into evidence at the hearing an Audiologic Report. Petitioner's Exhibit "A". However, the report is of no great significance for it fails to shed any light on the matter at hand. The report simply indicates that on November 4, 1977 Mr. Fleming had a hearing problem. After subsequent examinations in November and December 1980, a hearing aid was issued in [sic] February 5, 1981. Unfortunately, the report does not take into account the physical make-up of the court room. Issues relative to whether Juror Fleming could hear or not involve the volume of the court room's sound system, the juror's proximity to the speaker, the tonal quality of the speaker, and the ability of Juror Fleming to observe and read the lips of the trial participants. The Court, through personal observation, was able to judge these issues at the time of trial.

App. at 43–45.

Thus, to sum up the situation with respect to Fleming's hearing ability:

(1) In February, 1983, by affidavit, Fleming claimed that he could not hear the trial proceedings that took place from June 29, 1981 to July 2, 1981;

(2) Fleming contradicted the assertion of his deafness in a statement and/or affidavit some months after his initial affidavit;

(3) An audiological report (to which reference is made in the district court's opinion) revealed that at least in November, 1977 Fleming had a hearing problem;

(4) After examinations made in November and December 1980 a hearing aid had been issued to Fleming in February, 1981.

The district court's unilateral determination,[4] based on its inquiry to the jurors as to whether they could hear, and the district court's general "observations" of the jurors' ability to hear satisfied the court without more, that Fleming was competent to serve as a juror despite his claimed deaf-

4. Although the district court in its footnote 10 to its opinion refers to a "hearing" at which the audiological report was admitted in evidence, it is undenied that no hearing was ever had and that the audiologic report to which the district court refers does not appear in the submissions on appeal.

ness. No attempt was made to have medical evidence introduced. No attempt was made to call Fleming to testify. Indeed, no opportunity was ever afforded whereby the fact of Fleming's capacity to hear could have been established. The district court itself, in its opinion recognized that the audiological report on Fleming did not take into account the physical characteristics of the courtroom nor the abilities of Fleming to read the lips of witnesses (Fleming denied that ability in his first affidavit and claimed the ability in his second). With these circumstances forming the backdrop of Nicholas' appeal, I suggest that logic and reason require that our remand to the district court include a direction that a hearing be held on Fleming's ability to have heard the trial testimony.

### B.

It should be remembered that we have not been asked to decide the validity of Nicholas' conviction, i.e., whether the Fleming affidavits—admittedly inconsistent—constitute sufficient evidence to impeach the jury's verdict.[5] We are asked only to determine whether the conflicting affidavits concerning Fleming's hearing ability require that an evidentiary hearing be held. Thus, the majority's reliance on cases such as *Gov't of the Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), which addressed rulings made only *after* a post-trial hearing, is misplaced. In *Gereau*, for example, our court was not called on, as we are here, to decide whether a hearing should have been conducted. In *Gereau*, a hearing had already been held and the court's task was then to rule on whether extraneous influences (rumors circulating among jurors from unidentified source) impermissibly affected the jury verdict. Thus, the *Gereau* test, which delineates the burden of proof necessary in order to impeach a verdict, has little application to the instant situation.

### II.

Stripped down to its essentials, Fleming's contradictory affidavits present a situation no different in my opinion than the situation presented where a juror, on voir dire, has concealed information or has answered untruthfully, and because of the failure to disclose or the false answer, is impanelled as a juror—the knowledge of the untrue voir dire answers not being learned until after verdict. In both situations, i.e., where the affidavits are contradictory as in the instant case, or where the information given at voir dire is untrue, it is the juror himself who has lied. Under such circumstances, it is evident to me that a hearing must be ordered not only to learn the true fact as distinguished from the lie, but to assess prejudice. Indeed, it was the "juror-voir dire-false answer" circumstance that led to an *in banc* decision of this court in *United States ex rel. DeVita v. McCorkle*, 248 F.2d 1 (3d Cir.), *cert. denied*, 355 U.S. 873, 78 S.Ct. 121, 12 L.Ed.2d 77 (1957).

In *McCorkle*, Juror Kuhnle, sometime before the trial for which he was impaneled as a juror, had been robbed while carrying a night deposit to the National State Bank in Newark. Seven months later the appellant, DeVita, was charged with having robbed another depositor who was about to make a night deposit at the same bank. During the course of this latter robbery, a special police officer was killed. DeVita apparently presented no defense to the felony murder charge. The jury on which Kuhnle sat was concerned only with the question of whether guilt should be found with a recommendation of life imprisonment or whether the death penalty should be imposed.

Kuhnle was the fifth juror accepted to the jury panel. Although questions had been directed to other prospective jurors with respect to any previous experience, and Kuhnle's attention had been directed to those questions, Kuhnle did not disclose

---

**5.** The majority is properly concerned with issues of juror impeachment and recognizes, as I do, that jury verdicts should not easily be set aside. However, the majority focuses on impeachment of jury verdicts which do not arise from a circumstance where a juror was physi-

cally unable to hear the testimony. This, I suggest is a far cry from the focus required here, which is on Fleming's physical disability with its resulting disqualification of Fleming as a juror.

that he himself had been held up and robbed previously. Kuhnle was also asked if he knew the state police officers or personnel. He answered in the negative, although it was later shown that he knew a number of the Newark police officers since he usually called for a police escort each night that he was obliged to make a night deposit.

Other jurors who admitted to having robbery experiences or knowing police officers were excused. Kuhnle, who sat through the interrogation of the other members of the jury, nevertheless did not reveal either his own experience or his own acquaintance with the police. Subsequent to the trial, Kuhnle's knowledge came to light. DeVita sought the new trial based on affidavits which set forth Kuhnle's earlier robbery and the fact that Kuhnle had falsely denied knowing the police officers.

DeVita filed a habeas petition after the New Jersey courts had denied him a hearing and relief. The district court also denied DeVita relief, but an appeal to this court from that denial resulted in a reversal of the district court's order and a remand for a hearing. *See United States v. McCorkle,* 216 F.2d 743 (3d Cir.1954). Once again, the district court denied DeVita's petition. This denial, in turn, led to the *in banc* appeal. In that appeal, this court held that where a juror lied on voir dire with respect to questions which otherwise would have disqualified him, inherent prejudice attached which violated the defendant's fundamental right to a fair trial.

Here, as in *McCorkle,* a juror has lied. In the instant case, Juror Fleming has been responsible for two affidavits which in many respects are completely contrary in content. Just as Kuhnle had lied in *McCorkle* by refusing to disclose his robbery experience and his acquaintance with police officers, so Fleming has lied with respect to whether he heard or did not hear the trial testimony. The essential difference is that in Kuhnle's case, the underlying facts respecting Kuhnle's lie were undisputed; here, we have yet to learn which of Fleming's two scenarios (affidavits) is true. It is for that reason that I find it difficult to understand the majority's rejection of a hearing on remand so that the true facts may be ascertained. Clearly, if Fleming could not, and did not, hear the trial testimony, Nicholas has been unfairly tried.

### A.

Although there exist only a few federal precedents which discuss the competency of jurors who are hard of hearing, state courts have addressed the problem of deaf jurors with greater frequency. The federal authorities, which are discussed in a later portion of this opinion, do no violence to the position I have taken here, in that they, just as the state cases, do not relieve a trial court of holding evidentiary hearings in situations such as are presented here.

### 1.

The state court decisions underscore the fact that, in order to insure a defendant his constitutional right to a fair trial, his jurors must be physically qualified, that is capable of hearing and perceiving. Of particular importance is the requirement that the jurors be able to hear properly. One of the leading state decisions, *Commonwealth v. Brown,* 231 Pa.Super. 431, 332 A.2d 828 (1974), involved a juror who, after rendering his verdict, was discovered during a poll of the jury to be hard of hearing. The trial judge granted a further voir dire of the juror in question, and during the questioning, the juror admitted that he had difficulty hearing. The trial judge, however, did not grant a new trial. On appeal, the Pennsylvania Superior court held that the record substantiated that the juror was hard of hearing, and that in light of such a disability, prejudice should be presumed. The court emphasized:

> The presence of a juror with a physical impairment of such magnitude as to interfere with the juror's ability to hear and understand the presented testimony in evidence precludes a verdict by all jurors. Such a disability would render the juror incompetent to serve and would deny appellant's right to an impartial jury and a fair hearing. While a juror is

not disqualified per se because of his deafness ... where the deafness is of such a degree as to indicate that the juror may not have heard material testimony, the juror must be disqualified, rendering any verdict he gave as meaningless. 231 Pa.Super. at 436, 332 A.2d at 831.

In *State v. Berberian,* 118 R.I. 413, 374 A.2d 778 (1977), the Rhode Island Supreme Court addressed a similar situation. The defendant in *Berberian* had been charged with and convicted of reckless driving. In the course of polling the jury, it came to the court's attention that one of the jurors was hard of hearing. The trial court then conducted an examination of this juror, in which counsel for both sides participated, to determine the extent of the juror's impairment. During that examination, the juror indicated that he had difficulty in hearing. Although the juror stated that the attorneys and witnesses spoke loudly enough during trial for him to hear, when answering questions presented to him by the court, the juror had to have several questions repeated, and the juror's answers were frequently not responsive. Despite this evidence, the trial judge decided that, while the juror had a hearing impairment, it was not severe enough to preclude him from properly discharging his duties as a juror.

The Rhode Island Supreme Court on appeal reversed and remanded for a new trial, concluding that the trial court had abused its discretion in determining that the juror's deafness was not sufficient for disqualification. The court held that "[f]undamental to the [sixth amendment] right of an 'impartial' jury is the requirement that the jurors be competent and qualified .... It follows that a juror should be free from physical disabilities that would interfere with the proper discharge of his duties." 118 R.I. at 418, 374 A.2d at 781. The court in *Berberian* concluded:

> In this case, we find that the record indicates that the juror in question had a hearing impairment sufficient to deny the petitioner's right to a fair, impartial trial and a unanimous verdict. The ju-

ror's own statement that he was unable to hear all of the testimony in the case cannot be considered persuasive, since he would not necessarily be aware of what he could not hear. Thus, since the juror's deafness may have adversely affected his ability to decide the case intelligently, we must grant the petition for habeas corpus in order to insure a fair trial.

118 R.I. at 420–21, 374 A.2d at 782.

Other state courts have adopted the *Brown* and *Berberian* approach, holding that a deaf juror is an incompetent juror, and that any verdict rendered by such a juror must be set aside. *See, e.g., Commonwealth v. Golson,* 310 Pa.Super. 532, 456 A.2d 1063 (1983); *Commonwealth v. Greiner,* 309 Pa.Super. 291, 455 A.2d 164 (1983). *See also Eckstein v. Kirby,* 452 F.Supp. 1235, 1243 (E.D.Ark.1978) ("Evidentiary analysis, a juror's primary function, requires an unimpeded perception, for without the ability to perceive there is no ability to evaluate, reconcile or judge. The sense of hearing is, indeed, perhaps even more important to effective service as a juror than the sense of sight. This conclusion is buttressed by the realization that most evidence consists of oral testimony and that the function of a juror will largely be that of assessing the credibility of witnesses and analyzing testimony".)

2.

The federal authorities, although not directly holding that a deaf juror automatically invalidates a defendant's trial, nevertheless implicitly support the proposition that a juror's inability to comprehend testimony, whether due to mental or physical infirmity, may render the juror incompetent and lead to the nullification of the verdict. Even though, as I previously noted, this court's opinion in *Government of the Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) is not on point where the juror disqualification results from a physical infirmity and no hearing has been afforded, that case is instructive in that this Court concluded in *Gereau*

that the "incompetency of a juror during jury service" was also sufficient grounds to nullify a verdict.[6] 523 F.2d at 150.

In *United States v. Pellegrini*, 441 F.Supp. 1367 (E.D.Pa.1977), *aff'd*, 586 F.2d 836 (3d Cir.), *cert. denied*, 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978), the defendant alleged that a juror had an insufficient understanding of the English language. Although the court rejected the defendant's contention and held that the juror did have a sufficient working knowledge of the English language, implicit in the *Pellegrini* opinion was the fact that if the juror had been unable to understand English, the verdict would be overturned. *Id.* at 1371.

Other federal courts have also recognized juror incompetence as sufficient grounds to overturn a verdict. In *Sullivan v. Fogg*, 613 F.2d 465 (2d Cir.1980), the court required a post-verdict hearing on the mental competency of an allegedly insane juror. The court concluded that "there was a sufficient showing of incompetence to justify, indeed to require, a further inquiry by the trial court." *Id.* at 467. *See also United States v. Dioguardi*,[7] 492 F.2d 70 (2d Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974).

### III.

If, in the present case, the findings that emerge from a hearing reveal that juror

Fleming did hear the trial testimony, then no prejudice can be said to have attached to Nicholas' trial. If, on the other hand, the findings that emerge from the hearing reveal that Fleming could not hear the trial testimony, then of course, in my opinion, the prejudice would be evident.

### A.

It must be emphasized that the jury's verdict must be set aside if, in fact, juror Fleming was deaf and did not hear material trial testimony.[8] Every criminal defendant has a due process right to be tried by competent jurors. See *Peters v. Kiff*, 407 U.S. 493, 501, 509, 92 S.Ct. 2163, 2168, 2171, 33 L.Ed.2d 83 (1972); *Jordan v. Massachusetts*, 225 U.S. 167, 176, 32 S.Ct. 651, 652, 56 L.Ed.2d 1038 (1912). As Justice Marshall recently stated: "This Court has repeatedly insisted in a wide variety of contexts that the right to be tried before a jury capable and willing to decide a case solely on the evidence before it is a cornerstone of our criminal justice system." *McIlwain v. United States*, 454 A.2d 770 (1982), *cert. denied*, — U.S. —, 104 S.Ct. 409, 411, 78 L.Ed.2d 349 (1983) (Marshall, J. dissenting). *See also, Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

Apart from any due process claim or claim of fundamental unfairness, defendant Nicholas also has the right under the Fed-

---

**6.** *The Government of the Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976), opinion cited *United States v. Dioguardi*, 492 F.2d 70 (2d Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), as one example of juror incompetency. In *Dioguardi*, the defendant alleged that a juror was mentally incompetent. Although the *Dioguardi* court upheld the verdict in favor of the government because the defendant had not shown strong enough evidence of the juror's mental incapacity, the court nevertheless emphasized that a juror's "incompetence to understand the issues and to deliberate at the time of his service requires setting aside a verdict." *Id.* at 78.

**7.** I am not aware of any case which supports the contrary proposition: that a partially deaf juror *is* competent. In *United States v. Sears*, 663 F.2d 896 (9th Cir.1981) (juror with hearing impairment), *Lyda v. United States*, 321 F.2d 788 (9th Cir.1963) (deaf juror), and *United States v.*

*Pellegrini*, 441 F.Supp. 1367 (E.D.Pa.1977), *aff'd* 586 F.2d 836 (3d Cir.), *cert. denied*, 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978) (juror with difficulty understanding English language), the defendants' arguments in each instance were rejected based on the fact that the defendants had not offered sufficient evidence to question the competency of the respective jurors. Implicit in each decision was that if the defendant had met his burden of proof regarding the incompetency of the juror, the verdict would have been overturned.

**8.** The majority opinion does not reach this issue. It states:

> We need not decide whether the Sixth [or the Fifth] Amendment would be violated by trial before eleven good men [and women] and true and one who is hard of hearing. Maj. Opinion Typescript at 19.

(quoting *Lyda v. United States*, 321 F.2d 788, 791 (9th Cir.1963)).

eral Rules of Criminal Procedure to a unanimous verdict.[9] As Judge Seitz stressed in *United States v. Scalzitti,* 578 F.2d 507 (3d Cir.1978), unanimity plays an integral part in the institutional role of the jury:

> Unanimity serves to effectuate the purpose of the jury system by promoting the full expression of the views of all members of the jury and by insuring that those views are taken into account as fully and fairly as possible in reaching a verdict. Unanimity is an indispensible element of a federal jury trial because it serves the purpose of insuring that the views of a cross-section of the community are brought to bear fully on the same issues to be decided at trial.

*Id.* at 512 (citations omitted). Where one member of a jury is not competent to serve, the verdict cannot be said to be unanimous.[10]

### B.

I stress, however, that we are not called upon to make the final determination as to prejudice that the courts made in *McCorkle, Brown,* and *Berberian.* All we are asked to do is require that a hearing be held so that the underlying basic facts may be determined on which a conclusion of fundamental fairness or unfairness—prejudice or no prejudice—may be predicated. In this regard, it should be emphasized that

in *McCorkle,* the court found fundamental unfairness even without an evidentiary hearing, while in *Brown* and *Berberian,* the trial court, before concluding that prejudice was evident, had conducted an evidentiary inquiry into the competence of the juror. Unfortunately, such an inquiry to date has yet to be made with respect to juror Fleming.

I recognize that in different contexts, hearings respecting juror competence have only been triggered where strong evidence exists that the juror suffered from such incompetence during trial. *See, e.g., United States v. Dioguardi, supra.* Such cases, however, involved circumstances different than are presented by an instance of physical disqualification due to deafness. Even if it were otherwise, however, and even with recognition of the conflicting affidavits filed by Fleming, I am satisfied that in this case, there is sufficient evidence in the record to require a hearing.

The majority holds that even if Fleming's affidavits were unequivocal as to his inability to hear evidence at trial, the affidavits would nevertheless be insufficient to trigger a further inquiry into Fleming's incompetence, or into the prejudice suffered by defendant Nicholas. The majority concludes that such affidavits are excluded as evidence under Rule 606(b)[11] of the Federal Rules of Evidence, which are applicable

**9.** Rule 31(a) of the Federal Rules of Criminal Procedure provides: "The verdict shall be unanimous. It shall be returned by the jury to the judge in open court." Rule 31(a) applies to the District Court of the Virgin Islands pursuant to Rule 54(a). Fed.R.Crim.P. ("These rules apply to all criminal proceedings ... in the District Court of the Virgin Islands").

**10.** Rule 23(b) of the Federal Rules of Criminal Procedure allows for a jury of less than 12 in situations where both parties agree in writing. An amendment to the rule (effective August 1, 1983) provides that even absent a stipulation by the parties, a court may, in its discretion, approve a verdict of 11 jurors. The Amendment to Rule 23(b) cannot be applied to defendant Nicholas because it became effective after Nicholas' conviction. Moreover, even if the amendment were applicable, it clearly does not cover the situation where an incapacitated juror actually participated in rendering a verdict.

**11.** The majority concedes that Rule 606(b) does not exclude evidence dealing with juror incompetence as manifested by physical disability. It states: "[T]he dissent correctly notes that the plain language of Rule 606(b) does not exclude evidence dealing with juror incompetence, as manifested by physical or mental infirmities .... It is obvious that the drafters of the rule were primarily concerned with jury tampering or improper communications to the jury, and they were not focusing on any physical disability such as a juror's difficulty in hearing during the trial." Maj. Op. typescript at 16–18. With this concession—the majority's recognition that Rule 606(b) does not apply to evidence of a physical infirmity such as Fleming's (a physical infirmity which is undisputed)—I cannot comprehend how the majority can then proceed to exclude Fleming's affidavits as evidence, and use as its basis for doing so Rule 606(b).

in the Virgin Islands, *see* Fed.R.Evid. 1101. Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict or indictment or concerning his mental processes in connection therewith except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

I cannot agree with the majority's conclusion that the affidavits are excluded as evidence under Rule 606(b). In interpreting Rule 606(b) to prohibit the introduction of testimony relating to objective physical infirmities, such as the juror deafness involved in the present case, I believe the majority opinion has erred. Rule 606(b) of the Federal Rules of Evidence is a classification of the common law rule relating to juror testimony. *See generally, Government of the Virgin Islands v. Gereau*, 523 F.2d at 149. The rule was designed to prevent jurors from testifying as to their "mental operations ... in arriving at a given result." Fed.R.Evid. 606 advisory committee note. The fear was that if such subjective criteria were "allowed as a subject of inquiry, [it would] place every verdict at the mercy of jurors and invite tampering and harassment." *Id.*

Here, on the other hand, Fleming's affidavits relate to his deafness, an *objective physical infirmity.* The plain language of Rule 606(b) does not exclude evidence dealing with physical infirmities, and such objective testimony would not interfere with the public policy supporting the rule. Allowing jurors to "testify as to matters other than their own inner reactions involves no particular hazard to the values sought to be protected [by Rule 606]." *Id.* In my opinion, the standard announced in *United States v. Dioguardi, supra,* was more than met in this appeal despite the contradictions found in Fleming's second affidavit.

First, it should be noted that the affidavits submitted with Nicholas' motion for an evidentiary hearing, were not, as the majority states, "totally contradictory." For example, the district court was confronted with the undisputed statements that Fleming was at the least partially deaf during the trial and that he was required to rely on an electronic hearing aid to communicate. The district court itself acknowledged that Fleming had a hearing impairment when the court sought to explain away the audiological report which it had received. In doing so, the district court relied heavily on its own "observations" in concluding that Fleming could hear.

Moreover, I have great difficulty in understanding how hearing ability can be detected through visual observations. I have even more difficulty in sustaining the district court's exercise of discretion which concludes that Fleming *could* hear, based upon the court's "inquiry ... made of the jurors as to whether any of them had difficulty in hearing the proceedings, and instructing them to raise their hand to signify such difficulty." App. at 43–44. Findings made on general and *visual* observations of a juror's lack of "deafness" leave me singularly unpersuaded. In addition, the claim that juror Fleming did not raise his hand when the district court asked if any juror had difficulty hearing, is, on its face, not entitled to consideration.[12] In this case, unlike *Dioguardi*, where no evidence was proffered as to the juror's disability,

---

**12.** Significantly, Fleming's initial affidavit stated:

> Prior to my selection I was not asked whether, nor to what extent, I suffered a hearing impediment.
> App. at 12.

evidence was offered of Fleming's history of hearing deficiencies. That evidence included not only the audiological report, but also Fleming's uncontradicted statement that his deafness resulted from an injury suffered in military service.

I acknowledge that Fleming's two affidavits conflict with respect to the functioning of his hearing aid, his opportunity to read the lips of all trial participants, and the sufficiency of voice volume. In the circumstances presented here, however, it is not as if anyone disputes the facts that Fleming has had a hearing problem. Thus, any assessment of the evidence as to hearing must start from the premise that a hearing problem existed. Whether or not Fleming then heard the testimony at trial is the very question to which we seek an answer. ·

In my opinion, that answer can only be obtained when the totality of the circumstances surrounding Fleming's disability, as that disability may have influenced Nicholas' trial, are examined. Those circumstances, i.e., Fleming's hearing impairment, Fleming's execution of the two affidavits, Fleming's reasons for coming forward with the initial affidavit, the functioning or lack of functioning of his hearing aid, and the fact as to what Fleming heard or did not hear, can only be determined

when they are subject to examination at a hearing.

It is no answer to say that because the affidavits are conflicting on the issue of Fleming's inability to have heard the testimony, that the threshold standard for convening a hearing has not been met. I am satisfied that the district court had sufficient evidence before it to require an inquiry. As Judge Feinberg said, albeit in dissent, in *Dioguardi:*

It may be that after the record is amplified—at least by cross examination of appellants' witnesses and by testimony of government experts—the district court might be warranted in finding juror Rush [Fleming] to have been capable of jury service. I express no view as to that. However, at the very least, defendant[ ] [here, Nicholas] [is] entitled to a full hearing on the issue of the juror's competence.

492 F.2d at 86.[13]

## IV.

I therefore conclude that the district court abused its discretion when it refused to conduct an evidentiary hearing as to the extent of Fleming's deafness. The majority, by not requiring a hearing as to this subject, particularly since it has remanded

---

**13.** In *United States v. Dioguardi,* 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), the majority opinion held that a juror whose mental disabilities were revealed in a letter which she wrote after trial, nevertheless did not require a court's inquiry into her competence as a juror. The majority noted that there had been no evidence offered of any history of mental instability or evidence of any adjudication of insanity or incompetence.

A strong dissent was written by Judge Feinberg (now Chief Judge). The initial paragraph of his dissent reads as follows:

The majority opinion holds that an unsolicited, bizarre letter from a juror, who claims to be able to "see things before it happen" and to know what other people "are thinking," does not justify further inquiry into the juror's competence, even though seven psychiatrists preliminarily diagnose her as mentally ill. From this holding, I emphatically dissent. 492 F.2d at 83.

Judge Feinberg's opinion concluded:

I would only add the observation that, far from loosing a Pandora's box of challenges to jury verdicts (as the district court feared), a remand for a hearing here would have almost no precedential value because of the uniqueness of the fact. Nor would a hearing under these circumstances raise the twin spectres of juror harassment or incursion on jurors' privacy during their deliberations.... Moreover, an inquiry into competence need not entail a probe of jury discussions. 492 F.2d at 86–87.

I suggest that insofar as the majority here is concerned with the fear of ordering a hearing, the situation in the instant case is no different than the situation observed by Judge Feinberg in the *Dioguardi* case. Here, however, it is juror Fleming's ability to hear and to have heard, that has been brought into question. But as in *Dioguardi,* no precedential value would attach to any Fleming hearing because of the unique factual circumstance presented.

for an evidentiary hearing respecting the taped confession, has compounded the error of the district court. In doing so, it has denied defendant Nicholas the fair trial to which she is entitled. I therefore respectfully dissent.

### SUR PETITION FOR REHEARING

Before ALDISERT, Chief Judge, SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, and BECKER, Circuit Judges.

The petition for rehearing filed by Connie Nicholas, Appellant, in the above-entitled case having been submitted to the judges who participated in the decision of this court and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing before the court in banc, the petition for rehearing is denied. Judge Garth would grant the petition for rehearing for the reasons set forth in his panel dissent, *Government of The Virgin Islands v. Nicholas, supra* at 1073 (1985). In his dissent Judge Garth would have remanded for an evidentiary hearing concerned with the issue of Juror Fleming's claim of deafness.